This is the National Labor Relations Board v. Arrmaz Products, Incorporated and International Chemical Workers Union Council of the United Food as the intervener. Bernard Bober is here for Arrmaz. Joel Heller is here for the petitioner, NLRB. And August Vejar is here for the intervener. Mr. Bober, you may begin. Thank you. Good morning, your honors, counsel. May it please the court, my name is Bernard Bober of the Ogletree Beacons firm. I am here representing the employer, in this case, Arrmaz Products Inc. It is a pleasure and an honor to be permitted to argue in this court. I thank you for that. This case involves the union's challenge to the votes of two of our employees in a union election that was decided by two votes. But this is not the typical scope of the bargaining unit case that you may have seen before, in which different jobs are litigated as being within or without the scope of the union, depending on the nature of the work and the relatedness to the other jobs. And then ultimately, after litigation, the board makes a determination, one side or the other doesn't like it, and may end up in the appellate court. Rather, this is a breach of contract case. In this case, we have an agreement with the union brokered and drafted by the board agent on the board's form that tells us which of the jobs of the employees are considered in the voting unit and which are excluded. Let me stop you for one second now. Yes, your honor. You're here for the respondent. Yes. Do we have the right order for this argument? We do? Okay. All right, go ahead. Yes, your honor. The board first initiated the action with an application for enforcement of its order, but the rules state that when the employer responds with a petition to vacate the board order, it becomes the appellant. It briefs first, it argues first. Yeah, let me ask you to jump into the issue. I mean, so the contract language says that the employer is Armaz, Armaz, Armaz Products, limited partnership, engaged in the business of manufacturing and providing specialty chemical additives, and then it defines voters as all full-time and regular part-time production operators, something else operators, I'm going to try to pronounce, railside operators, small blends and warehouse operators, maintenance technicians, electrical and instrumentation technicians, custodians and parts clerks employed by the employer at a Smallbury, Florida facility. So why doesn't that language unambiguously mean that you have to be employed specifically by Armaz Products to vote in the election? Well, the labor board has developed a rule known as single employer. Yeah, and I guess that's, so I get if this language were unclear or if we were sort of just casting about for some kind of law to apply, but I mean, don't we just, shouldn't we just be looking at the language of the contract? As you said, this is a contract case. Your Honor, as a matter of law, the two votes in question, Mr. Hargadine, Mr. Strickland, they're paid on the payroll of Armaz Products, wholly owned subsidiary AMP trucking. And that's done for some insurance and liability reasons. But the law, as determined by the board in this case, undisputed by anybody, is that Armaz and its wholly owned subsidiary AMP trucking are a single employer. For purposes of labor law, they are determined to be one and the same employer. Nobody disputes any of that. And there's nothing in the record, Your Honor, that would suggest that when the board agent brokered this agreement and she wrote it this way, that either she or the union realized that two of our maintenance technicians were paid on the payroll of our wholly owned subsidiary that we control as a single employer. They learned that information later and seized on it to disenfranchise those two voters. But what we know from the inclusions and the exclusions are that included in the unit are all maintenance technicians at the Mulberry, Florida facility. These two gentlemen who were excluded are maintenance technicians at the Mulberry, Florida facility. But it says, but it's, I mean, what the language says, employed by the employer. Employer is a defined term. I mean, I guess, I guess if there weren't a defined term, it seems like your argument about joining employer and ambiguity would make sense, but it's a defined term. And why would we read something into the defined term that's not otherwise there? Your Honor, I respectfully disagree that it's a defined term. Usually when, I mean, I'm wrong, I'm wrong about that. The contract doesn't define the word employer. Well, it does not. Okay. I know that the Board of the Union keeps saying that to you in their briefs, but the name of the company is listed three times in the contract. It's in the form language as the title of the contract. This is Armas Products Limited Partnership, Case 12-RC-255997. That's just part of the form. That doesn't define the employer capital E. The third place, and I'll come back to the second, the third place is on the signature line. It doesn't define employer. There's a signature line for Armas Products, and the person who signed on behalf of the company signed under the signature line that the board agent typed. That's Armas Products. But it's Armas Products, Limited Partnership. And you could have put the other company name there. This is a contract, right? It's a contract? Your Honor, that's correct. So the parties to the contract here are Armas Products, Limited Partnership, not the other name company. A&P Trucking. Yes. I mean, it's very different. A&P Trucking is nowhere here. And you will see this. Wait a minute. A&P Trucking is nowhere on the document, and A&P Trucking could have been put right there. I'm not saying it had to be, but it certainly could have been. Certainly.  Whenever we have a... Agreement, election agreement between Armas Products. It's an agreement, it's a contract between two parties, and one is the employer and the other is the union. And that seems to be the end of it. I respectfully disagree, Your Honor. Whenever we have a contract interpretation dispute, both sides can always say, yeah, but now in hindsight, we could have said this differently or that differently. I don't know why... No, but in hindsight, we can't try to get... We're bound by the face of the contract. You said there's a third place to name. I got the first place, and I got that. Where's the third place? The third place is in the commerce section. This is the section of the contract where the parties spell out what is the business of Armas Limited Partnership. And in that commerce section, they did list the manufacturing of the chemical products, but they also mentioned the providing of those products to customers. Armas does the providing, the movement of its products. Yeah, but I don't think that helps you because in the commerce section, paragraph two says, Armas Products Limited Partnership of Georgia with an opposite and so on, and is engaged in the business of manufacturing and providing products during the past month, purchased and received in Florida. I mean, it again doesn't mention... It specifically mentions the partnership, but not the trucking company. And I will note, there's nothing in the record as to who the general partners are. The general partners of a limited partnership are the entities that are on the hook for its a challenge to disenfranchise two voters. It put in no evidence as to who was the general partner of this limited partnership. But aside from that... Well, have you put any evidence to show trucking company is one of the limited... is a member? No. I have none. There's none in the record. Can I ask you this? So this is a contract between Armas Products Limited Partnership and then the union. Let's just assume that this was a contract for the sale of goods, and it was between Armas Products Limited Partnership and, I don't know, Walmart or something. And then Walmart were to sue for breach of contract. Wouldn't they be limited to suing Armas Products Limited Partnership for breach of contract? Well, if... Perhaps not. If Armas said, oh, our wholly owned subsidiary was the party that you entered into the contract with, Walmart may have the argument that, yes, but you're a single enterprise. You're a single company, ultra vires. There is no distinction between you two. And here, in this case, for labor law purposes, the board found there is no distinction between these two employers. They are a single employer at this location. The fact that Armas pays these two gentlemen on a different payroll for liability and insurance purposes is irrelevant for purposes of whether they're included as Armas employees for labor law purposes. So what did the NLRB say about whether or not they are a single employer? They concede that they're a single employer, correct?  Yes, the hearing officer found it, the regional director found it, and the labor board didn't change that. What's interesting about this case is that both parties say that the contract is unambiguous. Which led me to my third argument, Your Honor. We both thought it meant different things. And as you de novo review a contract and decide whether to enforce it on its face when both parties thought it meant different things, there was no meeting of the minds. There was no contract reached. So if it is ambiguous, we look to extrinsic evidence to interpret the contract, and what would that extrinsic evidence be in particular? Please understand the process in which this happened. The petition for election was filed by the union on February 10. Four days later, the union signed this agreement. So in four days, the labor board agent is brokering this deal. She's writing this deal. She's putting it in front of the parties and they sign it. The extrinsic evidence from the union's perspective is that we know what they filed for with their petition. Their petition seeks a large bargaining unit. 51 employees, they said, employed by Arkema. Arkema is the ultimate, ultimate parent over all of these entities, over Armaz and Armaz's wholly owned subsidiary, AMP Trucking. So the union petitioned for a unit of all of it, in which it said in its petition, we want all the maintenance technicians, but we want none of the truck drivers. Those truck drivers are also paid on the AMP Trucking payroll. So that's what we know the union's mindset is. Exclude the truckers, give us everyone on site, including all the maintenance technicians. That's their mindset. You know our mindset because within 48 hours of signing the board's drafted stipulation and election agreement, under rule, we provided to the union and the board a list of all of the eligible voters, in which we included maintenance technicians, Hargadine and Strickland. That is under the board's speedy election rules. And the board said, we're going to make employers provide that list within two days, so that the board and the union petitioner can more quickly identify any challenges they have and raise them before the vote. So we can dispense with all of those issues and move this process as speedily as we can. This union took three weeks negotiating and lobbying Hargadine and Strickland, until I presume they determined that those gentlemen didn't support the union's petition and at the vote for the first time challenged their votes. Those votes remain sealed. They're dispositive. We asked the labor board to allow these maintenance technicians who work at this facility for a single employer to be counted. Just like the labor board typically argues when employers try to exclude votes. We want to enfranchise employees, not disenfranchise them. It's clear we do have jurisdiction though to entertain the petition for enforcement though, right? I argue not, Your Honor. The board's process is not yet final. The board has reserved a truly gigantic change in the law request made by its lawyers to apply a money damages remedy for refusal to bargain. This would change 54 years of settled law and would be a tectonic change in the remedies available. I understand that the board and the union argue, yes, other courts have considered this and they've let the part of the board order go forward towards enforcement. But respectfully, those other decisions are wrongfully decided. All of, and they rely on cases where the board issued a back pay remedy. It's clear in this case though that the remedy is not linked with the order to recognize and bargain with the union, right? They're not linked. That's true, Your Honor, but they do tie together. May I ask you to consider the practical reality of that? If this court took part of the case now and enforced the bargaining order and the labor board told us in their decision, they told us the board will issue a supplemental decision on the new remedy issue raised by the general counsel. So we'll get that someday in the future. But right now, the possibility of changing 54 years of labor law to create a new money remedy hangs over our head like an economic guillotine as we would go to the bargaining table. Also, remember, the law is quite clear. Nobody disagrees with this. The labor law does not require the employer to agree to any of the union's proposals. So how can any employer, waiting to find out if it has hundreds of thousands of dollars of new economic liability to its workers, sit at a bargaining table and talk about how much it's willing to pay them prospectively? As a practical matter, you can't. I'm curious about the new money damages remedy. Is that something other than back pay based on the wage or is it just amorphous damages for what? What is the new money damages? It's fascinating. The general counsel asked the board to give a money damages remedy for the lost opportunity to bargain. There's a delay in the opportunity to bargain because the employer has exercised its right. Well, but it's not it's not tied to a pay differential. Yes, it would be. They would they would concoct they would concoct a hypothetical labor agreement. What is the remedy now versus what the new remedy? No money damages. For 54 years, the law has said no money damages. So you just got to go bargain and come up, but you don't get like this back pay kind of money damage remedy. Yes, and they would be measuring. You answered my question. Thank you. Thank you, Mr. Bober. Mr. Heller, on behalf of the NLRB.  Good morning. May it please the court. Joel Heller for the National Labor Relations Board. Your honors, the board in this case reasonably determined that the stipulated election agreement unambiguously excludes these two employees from the bargaining unit, and the board thus properly declined to count their ballots in the representation election. Our last violated the NRA refusing to bargain with the union chosen by those employees who were eligible to vote. This record does reflect, though, that the union didn't object to the list of eligible voters, which included Mr. Strickland and Mr. Hargadine. That is extrinsic. So I don't I don't agree as a factual matter, but I also don't think it's relevant because that is extrinsic evidence. Let's get to whether it's correct or not. I thought that was the same. They didn't object. They were on the list of voters. And then the vote occurred. And after the vote occurred was when their objection was. Tell me what's wrong. Well, they objected at the time of the vote, which is how which is how it works. Okay, and so how long had they had the list of voters? I think that they actually, and intervener counsel perhaps can speak to this, but I think they actually did respond shortly after receiving the list of voters. They did raise this issue with the board agent about the inclusion of these two individuals on the voter list. But what was the period of time between the provision of the list of voters and the actual vote and the election? But I don't believe that any of that is relevant because you only get to extrinsic evidence. I understand if it's ambiguous. The problem why it's arguably ambiguous, arguably, is because of the labor law about single employer. And this exclusion does have a reference to maintenance and technicians in it. So that's arguably, it looks like it's a single employer and they were trying to get all, if you didn't have this reference to maintenance workers and technicians in the contract itself. So it says maintenance technicians employed by the employer, and there's only one employer mentioned anywhere in the stipulation. I understand that, but with the single employer law out there and this being a wholly owned subsidiary, you kind of get into what was the intent here. Judge Hull, if I may address the single employer issue. It's a red herring in this case because as Arma's counsel mentioned at the beginning, we are in the world of a stipulated election agreement. We are not in the world of litigating the scope of the election, or sorry, the scope of the bargaining unit, which is when a single employer theory might come into play. But here, there's a difference between cases where there's a stipulation, where the question of which employees are in the bargaining unit and thus which employees can vote is determined by reference to the stipulation itself. That's a different question, what the stipulation says, than the question of who would be in the unit if the scope of the unit were litigated. The First Circuit's decision in Barker Steel makes this distinction. There are board cases making this distinction as well. There's the case, the Hampton Inn case cited in the intervener's brief. And even in those situations where you are litigating the scope of the unit, a single employer finding doesn't necessarily mean that all employees of both entities are included in the same bargaining unit. And so even in that universe, a single employer finding is not determinative. But of course, we're not in that universe at all. We're in the stipulation universe, so I think it's even less relevant. Yeah, and so just to be clear, your argument ultimately is that the A&P Trucking Inc. employees are just not part of the union, right? They're not going to be part of the union? That's correct. Yeah, so I mean, well, I guess given that they're not part of the union, why would we even care about the joint employer, single employer idea at all? Like, we can just look to see, your position is you just look to see who's part of the union on the face of the contract, and then that's who gets to vote. In stipulated election agreements, yes, that's how it works. And so just using that to clarify one point, our last council talks about whether these employees have been disenfranchised, but the upshot of not being included in the bargaining unit is that they're not represented by the union. And so they're not voting in an election that doesn't impact them. So they're not disenfranchised. Like, I don't get to vote in Alabama state elections because I don't live here. That doesn't mean I'm disenfranchised. Right. I mean, just hypothetically, what would happen if, I don't know exactly how this facility works, but let's just assume that the employer wants to avoid bargaining with this union, and so they just say, you know what, RMAS doesn't employ any maintenance technicians anymore, AMP Trucking employs all the maintenance technicians now. So there just isn't anybody in the union.  What happens in light of that? So I think that would face some unilateral change liability if you're, I mean, that might consist of a separate unfair labor practice if you're removing people from the unit that were already part of the unit. Okay. I guess my, just to steel man their argument a little bit, it just seems like the best position that they have for saying that the single employer theory applies is that at the end of the day, they're not going to be free to just say, well, you're not part of this union because you work for AMP Trucking. That at the end of the day, they're going to have to have their maintenance technicians at this facility be part of the union, and they're not just going to be able to say, all future maintenance technicians are hired by AMP Trucking, sorry, so the union doesn't exist anymore. I mean, what do you say about that? Right. Again, well, certainly, I mean, there are other employees in the unit other than maintenance technicians, so those would still be there. But again, I think that we'd have to see what the facts, of course, are of the situation, of course, but I think it would be some kind of... I mean, wouldn't you show up and say you're a single employer or something like that? I mean, that's why I guess that's their point is that your response would be, you're a single employer, you can't do that, the union represents the maintenance technicians. And so my response to that is those are separate questions because they're dealing with separate issues. Scope of the unit in a stipulated election agreement case is one thing, and then single employer status for purposes of unfair labor practice liability is just a separate question. And so the single employer finding just does different work in the different contexts. For stipulated election purposes, essentially, I guess you could say you can contract around a single employer finding. But again, I think that's not even quite what's happening here because even if they were a single employer, sorry, even if we were litigating the scope of the issue, single employer finding isn't determinative. You still have to figure out which employees of the single employer are in the bargain unit. Even if there was only one employer, not a single employer issue at all, just you're straight up one employer. Not all employees of that employer are in a bargaining unit. You still have to decide who is in the unit. And here that is done by reference to the stipulation. Do you have challenges to voter lists? The problem is this voter list is not in the record. The list itself is not in the record. But I just figured out the dates. The voter list was provided two days after the agreement. The agreement was February 14th, 18th. And the election was not to March 12th. So it does look like it's almost a month, three weeks to a month when they provided the voter list. And then you had the election. And it was at the election they objected. So you do this kind of work since you work for the board or whatever. So I assume you get pre-election challenges to voter lists, that that's not uncommon. I can't say if it's uncommon or not. Well, you can have a challenge to the voter list before the election. I suppose you could. I will have to admit, Your Honor, I am an appellate attorney. So I don't actually know about all that.  And there was no challenge here. The union made no challenge to the list. I believe the record shows that they contacted the board agent and said, we have an issue with these two people being on the list. Maybe the day after the list was circulated, I believe intervener counsel. OK. You don't know if that's in the record or not. I believe there's a testimony. I think it was on page 86 of the record. But again, I believe you know this. But of course, our position, just to say it again, is you don't have to look at any of that extrinsic evidence because the board's finding was that under the First Prong of Cesar Sajo, this is unambiguously excluded. And so I would ask if the court disagrees with the board that this can be resolved on the first stage, which of course I don't want you to, then the step would be to remand it to the board, for the board to consider extrinsic evidence in the first instance. Because the board, in its order denying the request for review, said it has no need to pass on that other evidence. It was relying only on the first Cesar Sajo prong. We know that Armaz is the only employer mentioned. Ampey is not mentioned anywhere in this stipulation. Just saying Ampey is the only party. Why don't you address the non-final order issue? Certainly, Your Honor. Since we have little time left. Certainly, four courts of appeals have now ruled on this issue involving the exact same NACOLA relief remedy. And they've all ruled in the board's favor. None have come out the other way. That's the D.C. Circuit, the Second Circuit, the Third Circuit. Are there any dissents in any of those cases? We're not bound by any of those. Of course not. But just so you know the lay of the land out there. But of course, those decisions are all correct based on the statutory language. So Section 10C of the NLRA says that when the board finds an unfair labor practice, it shall issue an order requiring such persons, the person committing the unfair labor practice, to cease and desist from such unfair labor practices and to take such affirmative action as will effectuate the policies of the act. Now in the board's decision here, the order does precisely that. It orders, it finds that Armaz committed an unfair labor practice. It ordered it to cease and desist from refusing to bargain with the chemical workers and to take the following affirmative action necessary to effectuate the policies of the act. And that is bargain with the chemical workers and post remedial notice. Section 10E of the NLRA says that the board, after issuing this kind of an order, shall have the power to petition any court of appeals for the enforcement of such order. And upon the filing of such petition, the court shall have jurisdiction of the proceeding and of the question determined therein. So that's what we have here under Section 10C and 10E. This is a reviewable order. And that all aligns with more general administrative finality principles. This is a order that has, that legal consequences follow from it. Armaz has to bargain. It is the board's definitive statement on the violation, the failure to bargain violation, and the issue of the ballots. The answer, the, those two issues, whether there's later a make whole remedy is substantively, substantively independent of the violation and the bargaining requirement. Nothing that the board does on whether the issues are make whole remedy doesn't impact anything it found as to the violation. Just so if this court goes ahead and rules as we ask it to do on the order currently before it, it will not have to revisit any findings made in that determination. If it is later asked to review a supplemental order granting or denying for that matter this additional remedy. And Judge Hall, just to be clear, this make whole remedy has not yet been ordered by the board. So there's discussion of what the general counsel has asked the board to do and how remedy would work. But the board has not ruled on the issue one way or the other. So we don't know if it ever will or if it does, what that remedy would look like. The, so there might not be a separate appeal, a second appeal, because the board might not rule on this issue. And just one final point, Armaz's arguments about what bargaining, what he calls the practical matter of how this remedy would work, those are policy arguments. That's not a legal argument. It doesn't go to the finality of the board's decision to sever the make whole issue and to proceed with its bargaining order, asking the court to enforce that order so that bargaining can begin four years after these employees have voted for union representation. Thank you. Thank you, Mr. Heller. Mr. Behar. May it please the court, Randall Behar on behalf of the Intervenor Union. Judge Hall, if I may address one of your questions. If you take a look, and this is in the brief, the NLRB's case handling manual on representation section 11338.5 provides that when one of the parties, whether it's a union or company for that matter, raises verbally a question to challenge a ballot at any time prior to the time the ballot is dropped in the box, that challenge should be honored. In fact, that wasn't the first time, and the union did do that timely. But the union also raised an objection to the board attorney, to the board agent, the day or so after the employer list was provided to them. The employer list was provided after the stipulation was executed. When you're interpreting a contract, you have to look at what both sides knew at the time it was entered into, not something they may learn later. Why would Arnaz put these two people, Strickland and Hargenden, on the list to begin with? Probably because they thought that they would vote against the union, to be quite honest. I can't, you know, I can only speculate what's in their mind, but what I can tell you is. Well, couldn't it have been because they thought they were a single employee and that worked in the same facility? They really were all messed together. I don't think so, and I'll tell you why. I mean, that's a reasonable possibility. And I'll tell you why. All right. The union rep who negotiated the 2020 stip also negotiated, and this is in the record at pages 82 through 87. He also negotiated a stip in 2015 with Arnaz, okay? With Arnaz Products Limited Partnership. And he got, and it's in the testimony and later on, the original director went back and looked at the administrative record, and he says it, the original director, in his decision, that in 2015, Mr. Strickland, who was employed by AMP Trucking Corporation both in 2015 and 2020, the other guy was not back in 2015, that the employee list did not include Mr. Strickland back in 2020. He was working the exact same thing. In 2015, he was in 2020. The union had no reason and did not intend when it entered into the 2020 list to include Mr. Strickland. That was a change on the employer's position of what they had done five years before. They never raised that with the union. There's no evidence that the, and on the single employer theory, most of that evidence was unknown to the union until six months after the election. This is a contract. If this had been a hearing, okay, and we didn't have the expedited procedure of a contract to try to expedite this thing, it's kind of funny, you know, four and a half years after the election and over three years since the union was certified, we're arguing that they haven't bargained for that period of time. It's the common delay technique. You ask why would they do some of these things? They've done everything they possibly can to delay because they know the only remedy is to say for you to enforce the order today and say from this day forward, you have to  There's no remedy for that four and a half, three and a half years that they've thumbed their nose at the employees who said we want a union. The other thing, I do disagree with one thing. I don't think that you need to remand it if you find that the stipulation is not unambiguous and the reason for that is the regional director also found there was not a community of interest between these two truck driver maintenance technicians who took care of the trucks as opposed to the maintenance technicians who take care of the facility and they never appealed that determination. So the regional director's determination that there was not a community of interest to force the union to accept a whole other employer, single employer or not employees into their unit, they haven't appealed that. And so the regional director's determination stands that even if you look at the single employer issue, which you should not, you look at what did the union know and what did the parties intend when they entered into the stipulation. There's no evidence that the union knew what the relationships were. There's no evidence that they knew that they were all filing common tax forms together, who was paying this tax or who was paying this insurance. Unions don't normally know that until it's litigated down the road. All right. We have your argument. We have your argument, counsel. Thank you. Thank you. Thank you, Your Honor. That last point may be dispositive. I was about to say it before Mr. Veeher did. When they signed the stipulated election agreement, they had no idea that maintenance technicians hargeting in Strickland were paid on an AMP payroll compared to Armaz Products. Armaz Products was the overarching entity at this facility. It runs, it manufactures products at this Mulberry, Florida facility. Now, we know that for insurance and tax purposes, we pay some of these people that touch the trucks, maintenance technicians that touch the trucks, we pay them on the truck income because they maintain the insurance and the liability exposure for all things related to trucking. And that's a corporate formality issue that, just like you raised, Judge Brasher, if we tried to use this as a shield, the Labor Board would never let us get away with that. That's the whole purpose of the Single Employer Doctrine. Why don't we set up a separate corporate entity in payroll and pay each person that employs one person at a time? Then nobody can engage in collective action because you can't have a bargaining unit of one person. We could insulate ourselves from union organization just as a simple matter of corporate formality. That would never get past the Labor Board because of the Single Employer Doctrine. And so, just like Mr. Vihar emphasized, to interpret this contract, we look at what they knew at the time. They had no idea that there was a different payroll. What they knew is that at Mulberry, Florida facility, you have maintenance technicians that we want in our voting unit. That's what they knew, and they said it on their petition. We don't want your truck drivers. We see them around the area, too. We don't want them, but we want your maintenance technicians. Well, they got our maintenance technicians. We listed them on the voter list. And you're right, Judge Hall. Of course, they can file an objection before them. I don't know if they had a conversation on the phone with the board agent sometime later. There's nothing in the record about that. I have to make a comment about finality, please. Both the union and the board cited for, in terms of administrative finality, the Stevens Media LLC versus NLRB case, this is a D.C. Circuit case from 2012. That case sets out two criteria for the finality of an administrative order to be reviewable on appeal. And those two criteria come from a Supreme Court case that should guide this issue. The Supreme Court case is Bennett versus Speer, 520 U.S., 154. That's a 1997 Supreme Court case. And the two criteria are these. Number one, the agency action must mark the consummation of the agency's decision-making process. And number two, the case says, the Supreme Court says, must also be one by which rights or obligations have been determined and from which legal consequences flow. In the briefs of the board and the union, you will find discussion only of the second item. Legal consequences flow from this bargaining order. Well, yes, that's right. We could sit down and we could talk about all the things that we're not able to do right now because we're waiting to see if the guillotine drops. Yes, but he just clarified right now it's just a general counsel recommendation of the  The board's not acted on it. But they told us they will. Well, we don't know. I mean, there are all kinds of administrative things that are going on. The EPA may do this. They may change their decision on January 20th. You know, we don't know what's going to happen. So I don't know that some agency is going to provide another remedy down the road that was all speculative, keeps this order from being final. And we have no idea what they're going to do. Your Honor, I'm taking them at their word. They wrote it in their December 6, 2022 decision. The board will issue a supplemental decision. Well, we don't know what the decision is going to be. And that's the purpose of the finality rule for appealability. You shouldn't be taking that. But he's saying they will do a supplemental decision. But the board right now, like you said, there's 50 years of law. You don't get the money damages. And he's saying right now there's not even a rule. It's just a general counsel suggestion to the board. Is that wrong? No, that is correct. It's just a general counsel who's made this proposal to the board. And who knows what the board is going to do. That is correct. OK, thank you. And that explains it. I appreciate it. The last point is about the first of the Supreme Court's requirements. The action must mark the consummation of the agency's decision-making process. The board's own opinion told us they have not finished their decision-making process in this case. They will issue a supplemental decision. They're in process. They've had it for two years now. That was December 6 of 2022. We're just a few weeks short of the second anniversary. We're all waiting. The court should not spend any more of its time on the case until the board finishes doing what it told us it was going to do. Thank you. All right. Thank you, counsel. Court is in recess until 9 o'clock tomorrow morning. All rise.